UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DANIEL LEWIS, also known as    :
NASEER SHAKUR,                 :
                               :
        Plaintiff             :    No. 1:12-CV-02208
                               :
    vs.                        :    (Judge Kane)
                               :
JOHN WETZEL, et al.,           :
                               :
                               :
        Defendants            :

MEMORANDUM

I.  Background

        On November 5, 2012, Daniel Lewis, also known as Naseer

Shakur, an inmate serving a life sentence for murder[1] and

presently confined at the State Correctional Institution,

Graterford, Pennsylvania[2], filed a 3-page form complaint under 42

U.S.C. § 1983 against twenty-three individuals presently or

formerly employed by the Pennsylvania Department of Corrections.

Doc. 1.  Because Lewis's statement of claim consisting of one

_____

1.  The docket of the Court of Common Pleas of Philadelphia
County available online via Pennsylvania's Unified Judicial
System Web Portal reveals that Lewis on September 19, 2007, was
convicted of murder of the first degree, firearms not to be
carried without a license and possession of an instrument of a
crime with intent.  He received a sentence of life imprisonment
for first degree murder, a consecutive sentence of 3 ½ to 7 years
for firearms not to be carried without a license, and a
concurrent sentence of 2 ½ to 5 years for possession of an
instrument of a crime with intent. Commonwealth of Pennsylvania
v. Daniel Lewis, CP-51-CR-1201581-2005, https://ujsportal.
pacourts.us/DocketSheets/CP.aspx (Last accessed December 4,
2015).

2.  At the time Lewis filed the complaint he was incarcerated at
the State Correctional Institution at Fayette, LaBelle,
Pennsylvania.

sentence was completely conclusory, by order of November 7, 2012, he was directed to file an amended complaint. Doc. 7.  After being granted an extension of time, Lewis on December 17, 2012, filed a 67-page, handwritten, amended complaint consisting of 148 numbered paragraphs and a prayer for relief consisting of paragraphs A through L. Doc. 11.

     In the amended complaint Lewis names as defendants 25 individuals presently or formerly employed by the Pennsylvania Department of Corrections. Id.  The majority of the defendants are or were located at the State Correctional Institution, Huntingdon, Pennsylvania ("SCI-Huntingdon"). Id.  The remaining defendants are or were located at the Department of Corrections' administrative offices in Mechanicsburg and Camp Hill, Pennsylvania. Id.  The 25 defendants are as follows: (1)John Wetzel, Secretary of the Department of Corrections; (2) Jeffrey Beard, former Secretary of the Department of Corrections; (3) Tabb Bickell, Superintendent of SCI-Huntingdon; (4) R. Lawler, former Superintendent of SCI-Huntingdon; (5) James Eckard, Deputy Superintendent at SCI-Huntingdon; (6) Brian Corbin, former Deputy Superintendent at SCI-Huntingdon; (7) Garman, Deputy Superintendent at SCI-Huntingdon; (8) J. Keller, Classification Program Manager and member of Program Review Committee at SCI-Huntingdon; (9-11) Lieutenants Fogel, Dunkle, and Johnson at SCI-Huntingdon; (12) Charles Mitchell, Hearing Examiner at SCI-Huntingdon; (13) Connie Green, Grievance Coordinator at SCI-Huntingdon; (14-18) Corrections

Officers N. Lehman, McDermott, McDowell, Cook and Heaster at SCI-Huntingdon; (19-20) Robert Macintyre and Robin Lewis, Chief Hearing Examiners for the Pennsylvania Department of Corrections; (21) Richard Goss, psychologist at SCI-Huntingdon; (22-23) Corrections Officers Kyle and Riggleman at SCI-Huntingdon; (24) James Barnacle, Chief Investigator/Director of the Office of Special Investigations; and (25) Dorina Varner, Chief Grievance Coordinator of the Department of Corrections. Id.

In the amended complaint, Lewis raises a host of claims starting in May 2008, against the defendants relating to his alleged 3 ½ year stay in the Restricted Housing Unit ("RHU") at SCI-Huntingdon. Id. Lewis divides his amended complaint into the following five sections: (1) excessive solitary confinement (Id., ¶¶ 1-23); (2) custom of using falsified misconducts (Id., ¶¶ 24-65); (3) custom of using excessive force (Id., ¶¶ 66-115); (4) custom of demeaning sexual harassment and voyeuristic nude photography (Id., ¶¶ 116-140); and (5) custom of systematic denial of grievances (Id., ¶¶ 141-148). Lewis contends that the conduct of the Defendants violated his rights under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

The overall outline of Lewis's amended complaint is set forth in paragraphs 1 through 3 which state in toto as follows:

1. Starting from May 29th, 2008 a day after plaintiff was first placed in the Restricted Housing Unit ("RHU") at SCI-Huntingdon on trumped up misconduct reports by

3

officers Thompson, Marlett, and Prokop[3] he had been at
various times subjected to the long established custom
of abuses of SCI-Huntingdon's RHU, such custom of abuse
consist of inflicting both psychological and physical
pain and suffering upon inmates in the RHU through
physical assaults, verbal threats, provoked cell
extractions, denial of basic life necessities such as
showers, food, yard exercise and mental health services,
contamination of food by officers, voyeuristic and
violent demeaning sexual harassment as a result of being
forced to submit to nude photography, retaliation for
reporting abuses through grievances and/or verbally
protesting such abuses, the use of excessive and
retaliatory solitary confinement under the guise of
categorizing targeted inmates as displaying maladjustive
behavior, and most of all false misconducts.

2. Such custom of abuse had been able to flourish for
many years in the RHU because of the use of cover-up
tactics by both the institutional and central office
administrative officials and the very blatant and
callous disregard of both of the same officials to
take meaningful steps to end the abusive practices once
they're made aware of them through both informal and
formal complaints such as grievances and personal
correspondences.

3. Plaintiff states as a fact that he has been
personally subjected to the long established custom
of abuses in SCI-Huntingdon's RHU and made to suffer
under inhumane conditions of confinement with the
full knowledge and expressed authorization of both the
institutional administration at SCI-Huntingdon, . . .
and the central office administration at Camp Hill . . .

Id., ¶¶ 1-3. Lewis sets forth throughout the complaint several

instances where he was charged with and found guilty of violating

prison regulations. Lewis claims that all of these charges were

false or fraudulent.  He also alleges that he was subjected to the

use of excessive force by prison guards on several occasions and

_____

3.  Corrections Officers Thompson, Marlett and Prokop are not
named in the complaint as defendants.

grievances which he filed were systematically denied by personnel at SCI-Huntingdon and then by administrative personnel of the Pennsylvania Department of Corrections.  With respect to the supervisory or administrative defendants, Lewis does not allege that they were involved in the conduct giving rise to his grievances.  He merely alleges that they are liable because the multiple instances of the alleged use of excessive force, filing of false misconducts, and denial of grievances, etc., rose to the level of a custom.[4]

On November 20, 2014, Defendants filed a motion to dismiss portions of the complaint pursuant to Rule 12(b)(6). Defendants' motion is ripe for disposition.  For the reasons set forth below Defendants' motion will be granted other than with respect to one verbal harassment claim which escalated into violence and due process claims against Defendant Mitchell, the hearing examiner at SCI-Huntingdon.[5]  As will be explained more

_____

4.  A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law.  City of St. Louis v. Praprotnik,485 U.S. 112, 127 (1988).  Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." Depew v. City of St. Mary's, Ga. 787 F.2d 1496, 1499 (11th Cir. 1986). "Not all state action rises to the level of a custom or policy. . . A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'" Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir. 2003)(quoting Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397,404(1997)).

5.  It is argued that the claims against Mitchell should be dismissed for lack of personal involvement. That argument does
(continued...)

fully hereinafter, the court will review the claims against Defendant Mitchell and dismiss those claims pursuant to the screening provisions of the Prison Litigation Reform Act of 1995 ("PLRA").  Also, the claims against several defendants for allegedly filing false misconduct reports will be dismissed pursuant to the screening provisions of the PLRA.

## II.  **Motion to Dismiss**

Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Under Rule 12(b)(6), we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.2009) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008)).  While a complaint need only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Id. at 570, 550 U.S. 544, 127 S.Ct. 1955 at 1974, 167 L.Ed.2d 929.  "The plausibility standard is not akin to a 'probability requirement,' but it asks

---

5.  (...continued)
not have merit.

for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal,___U.S.___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 556, 127 S.Ct. at 1965.) "[L]abels and conclusions" are not enough, Twombly, 550 U.S. at 555, 127 S.Ct. at 1964-65, and a court "'is not bound to accept as true a legal conclusion couched as a factual allegation.'" Id., 127 S.Ct. at 1965 (quoted case omitted).

In resolving the motion to dismiss, we thus "conduct a two-part analysis." Fowler, supra, 578 F.3d at 210. First, we separate the factual elements from the legal elements and disregard the legal conclusions. Id. at 210-11.  Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'" Id. at 211 (quoted case omitted).

In addition, because Lewis complains about "prison conditions," the screening provisions,  28 U.S.C. § 1915(e), of the PLRA apply,[6] given that Lewis was granted in forma pauperis

---

6.  Section 1915(e)(2), which was created by § 804(a)(5) of the PLRA, provides:

> (2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at anytime if the court determines that (A) the allegation of poverty is untrue; or (B) the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.

status to pursue this suit.  The court's obligation to dismiss a complaint under the PLRA screening provisions for complaints that fail to state a claim is not excused even after defendants have filed a motion to dismiss. See, e.g., Lopez v. Smith, 203 F.3d 1122, 1126 n. 6 (9th Cir. 2000). Hence, if there is a ground for dismissal which was not relied upon by a defendant in a motion to dismiss, the court may nonetheless *sua sponte* rest its dismissal upon such ground pursuant to the screening provisions of the PLRA. See Lopez; 203 F.3d at 1126 n.6, Dare v. U.S., Civil No. 06-115E, 2007 WL 1811198, at *4 (W.D.Pa. June 21, 2007), aff'd, 264 Fed. App'x. 183 (3d Cir.2008).

### III.   Statement of the Allegations of the Amended Complaint

The court has thoroughly reviewed the complaint and will at this point set forth the factual averments made by Lewis. Furthermore, the court will attempt to limit this review to the allegations against the named defendants.[7]

On September 29, 2010, Lewis claims that he was issued a false misconduct report by Corrections Officer Spillman[8] for "disobeying a direct order to stop kicking [his] cell door and that as a result of the kicking plaintiff had broken the plexiglass support on the cell door[.]" Doc. 11, Amended Complaint, ¶ 26.  Lewis asserts that Defendant Mitchell "lacking

---

7.  Throughout the complaint Lewis refers to numerous individuals who are not named as defendants.

8.  Corrections Officer Spillman is not named as a defendant.

all impartiality refused to have relevant evidence entered into the hearing to be reviewed to determine whether the cell door was broken by plaintiff or was the cell door already broken before he was moved in the cell as plaintiff claimed[.]" Id., ¶ 27.   Lewis then claims that Defendants Eckard and Corbin denied his appeal of Defendant Mitchell's decision finding him guilty of the misconduct. Id., ¶ 28.

On September 30, 2010, Lewis alleges that he sent a "DC-135A request to staff member form"[9] to defendant Raymond Lawler, who apparently at the time the request form was sent was the Superintendent at SCI-Huntingdon. Id., ¶6.   In the form Lewis complained about "falsified misconducts" filed by corrections officers employed in the RHU at SCI-Huntingdon and that he was "being excessively confined in the RHU under inhumane conditions[.]" Id.   Lewis also complained about an "assault (and falsified misconduct)" by Corrections Officer J. M. Gray[10] which allegedly occurred on November 13, 2009, over ten months prior to the submission of the request form. Id., ¶¶ 7-8.   Corrections Officer Swartz[11] responded to the request form but not to the satisfaction of Lewis and Defendant Lawler "did not take any steps

---

9.   This form is utilized as part of the Department of Corrections' informal grievance process and is used before filing a formal grievance.

10.   Corrections Officer Gray is not named as a defendant.

11.   Corrections Officer Swartz is not named as a defendant.

to end the abusive practices pertaining to excessive solitary confinement[.]" Id., ¶ 9.

Lewis alleges that on October 28, 2010, he was "provoked into a cell extraction" by Corrections Officer Spillman who "verbally assaulted" him "in a hostile tone of voice" and Lewis "[b]ecause of the serious provocation from the inflammatory language that enraged him . . . accepted the officer's challenge[.]" Id., ¶ 10. Lewis alleges that on October 29, 2010, former Deputy Superintendent Randall Britten[12] visited SCI-Huntingdon and during the tour of the facility came to Lewis's cell at which point Lewis informed Britten "about all the abuses he was suffering" including "excessive solitary confinement[.]" Id., ¶ 11.

Lewis alleges that on August 4 and October 31, 2010, he was issued false misconduct reports by Defendant Heaster for "disobeying a direct order and using abusive language" and that Defendant Mitchell "automatically believe[d] the officer's word" and found him guilty. Id., ¶ 29. Lewis claims that video camera footage which Defendant Mitchell allegedly refused to look at would have shown that the misconduct report of August 4th was false. Id., ¶ 30. Lewis further claims that Defendants Eckard and Corbin who addressed Lewis's administrative appeal of the August 4th misconduct also "refused to view the video footage" and

---

12. Britten is not named as a defendant.

"refused to take the necessary steps to discover whether the misconduct was falsified[.]" Id., ¶ 31.

With regard to the October 31st misconduct report, Lewis claims Corrections Officer Heaster "verbally assault[ed] [him] with abusive and threatening language" and then issued "a falsified misconduct . . . representing that [he] used abusive language toward him." Id., ¶¶ 12 and 15.  Lewis further contends that he was denied his right to attend the disciplinary hearing. Id., ¶ 32.  Lewis states that Corrections Officers Hall[13] and Edwards[14] refused to escort him to the hearing and falsely claimed on a Department of Corrections' form that he waived his hearing. Id.

Lewis filed a grievance with Captain B. Harris[15] regarding the misconduct reports filed by Defendant Heaster which Captain Harris denied. Id., ¶ 33.  Lewis states that he provided a copy of this grievance to Defendants Lawler, Eckard, Corbin and Green. Id.  Lewis contends that Defendant Heaster's issuance of

---

13.  Corrections Officer Hall is not named as a defendant.

14.  Corrections Officer Edwards is not named as a defendant.

15.  Captain Harris is not named as a defendant.

the allegedly false misconduct reports was "tacitly"[16] approved by
Defendants Lawler, Eckard, Green and Corbin. Id., ¶ 34.

With regard to the August 4 and October 31, 2010
misconduct reports filed by Defendant Heaster, Lewis does not
claim they were filed because Lewis filed grievances. Instead
Lewis claims as follows: "Defendant Heaster with the tacitly
expressed approval of Defendants Lawler, Eckard, Green and Corbin
in the institutional administration issued the falsified
misconducts for the sole and express purpose of further burying
plaintiff in solitary confinement by making sure that he was given
additional disciplinary custody in the RHU in order to
psychologically torture plaintiff and to maintain his
vulnerability to physical abuse." Id., ¶ 34.

On December 8, 2010, Lewis attended a Program Review
Committee ("PRC") hearing which apparently consisted of Defendants
Keller, Eckard and Corbin. Id., ¶ 16-23.  At this hearing Lewis
requested that he be "afforded a program transfer or a swap
transfer due to the problems involving his conditions of
confinement" and "the excessive solitary confinement[.]" Id.
Lewis's request was denied by "Defendant Corbin speaking on behalf

---

16.  It appears that Lewis is claiming that these defendants are
liable merely because they were notified by way of the grievance
filed with Captain Harris of the issuance of the misconducts
reports by Defendant Heaster and that this establishes a custom,
practice or policy.

of the entire committee[.]" Id. Lewis alleges that Defendant

Corbin falsified "the PRC report stating that plaintiff was

incurring misconducts to manipulate transfer" and "the

falsification of the report was a cover up tactic and retaliatory

accusation made in response to plaintiff informing institutional

administrative officials about the abusive practices RHU officers

were perpetrating against plaintiff causing him to suffer under

inhumane conditions of confinement[.]" Id.  Lewis then filed

grievance #347660 relating to this decision of the PRC and the

grievance was subsequently denied by Defendants Eckard, Corbin,

Green and Bickell[17] "at the institutional level" and Defendants

Varner, Wetzel and Beard at the central office level. Id.

Lewis throughout the amended complaint enumerates

alleged instances where he was issued false misconduct reports

which he claims were issued "with tacitly expressed approval of

institutional and central office administrative officials, in

order to bury [him] in solitary confinement as a means of

_____

17.  Defendant Bickell who is referred to in paragraph 22 is
alleged to have succeeded Raymond Lawler as Superintendent of
SCI-Huntingdon.  Bickell, along with Defendants Eckard, Corbin,
Lawler, Keller, Green, Varner, Beard, and Wetzel, are alleged to
have exhibited "callous disregard" to the rights of Lewis and
continued to subject Lewis to "the custom of abuses in SCI-
Huntingdon's RHU and arbitrary and excessive solitary confinement
when [they] failed to use their administrative powers to end the
[] custom of abuse of arbitrary and excessive solitary
confinement . . . and psychological torture and physical
abuse[.]" ¶ 22.

psychologically torturing [him] and keeping him vulnerable to physical assault[.]" Id., ¶ 24. Lewis makes a conclusory allegation that there was a conspiracy among the Defendants to issue false misconduct reports against him and that Defendant Mitchell, the hearing examiner at SCI-Huntingdon, systematically denied him due process, including by denying him the right to call witnesses at hearings and making false statements on hearing disposition forms. Id., ¶ 25.

On January 3, 2011, Lewis claims that he was issued a falsified misconduct report by Corrections Officer J.D. Watt[18] apparently related to an order from the officer to uncover a night light. Id., ¶¶ 35 and 71-74. During this incident Lewis alleges that he was sprayed with oleo capsicum (pepper spray) which claims resulted in breathing problems and temporary loss of eyesight; he was removed from his cell, stripped naked and photos of his genitals and buttocks taken; his legal property confiscated;  and he was "placed in a strip cell in a suicide smock."  Id., ¶¶ 73- 74.  Lewis admits that he did not attend the hearing relating to the misconduct report generated as a result of this incident "because he knew that based on Defendant Mitchell's continuous biasness (sic) in favor of RHU officers he wouldn't get

_____

18.  Corrections Officer Watt is not named as a defendant.

14

a fair hearing and would be automatically found guilty[.]" Id., ¶ 35.

On January 13, 2011, Lewis claims that Defendant Cook along with another corrections officer, Fisher, who is not named as a defendant "concocted a scheme to provoke [him] into a staged cell extraction and issue him a falsified misconduct[.]" Id., ¶ 37. Lewis alleges that he complained about his food being contaminated with some "non-food substance" and Defendant Cook refused to bring the matter to the attention of "the sergeant." Id., ¶ 37-38. Lewis claims that Defendant Cook threatened him and walked away. Id. Cook then accused him of refusing to return his food tray and using abusive language towards a corrections officer. Id. At the hearing on January 18, 2011, with regard to this misconduct, Lewis claims that Defendant Mitchell denied him due process by denying him the right to present evidence and call witnesses and refusing to view the available evidence.[19] Id., ¶ 39. Lewis then claims that Defendants Garman, Eckard and Macintyre violated his rights by affirming Mitchell's decision. Id., ¶¶ 40-41. Lewis further alleges he filed grievances relating to the alleged false misconducts and those grievances were denied by

---

19. Lewis does not specify the evidence or identify the witnesses. He further never indicates what disciplinary sanctions Defendant Mitchell imposed for the numerous misconducts of which he was found guilty during his alleged 3½ year confinement in the RHU.

Defendants Green and Varner. Id., ¶ 42. With regard to the January 13, 2011, false misconduct charge "concocted" by Defendant Cook and corrections officer Fisher, Lewis does not set forth any allegation that Cook filed the misconduct because Lewis filed grievances. Id., ¶¶ 37-38.

Lewis alleges that Defendant Lehman on April 7, 2011, issued a false misconduct report in which Lehman accused Lewis of attempting to assault him. Id., ¶ 43. Lewis further alleges that Defendant McDermott "knowingly allowed himself to be placed on the misconduct knowing that it was falsified[.]" Id. Lewis's version of the incident is that on April 7th he was being moved to another cell by Corrections Officers Lehman, McDowell and McDermott and that while standing in front of the cell waiting for his property to be placed in the cell he was handcuffed behind his back and holding a pillow case full of his property. Id., ¶ 77-78. At that point Lewis claims that Lehman started to pat search him without warning or an order to submit to such a search and Lehman suddenly became aggressive and Lewis objected. Id. Lehman then allegedly warned Lewis "if he moved he'd break his '[expletive] head'" and "became even more aggressive and struck [Lewis] in the back of the head while [Lewis] had his back turned towards him causing [Lewis] to hit the metal cell door which in turn caused the top of [Lewis's] right eye to split open and bleed profusely

16

and caused him to become dizzy suffering a slight concussion."
Id., ¶ 78.  Lewis then claims that Lehman grabbed him and slammed
him face first on floor causing further injury to his head. Id., ¶
79. Lewis further claims that Defendants McDowell and McDermott
"watched the whole incident and did nothing to stop Lehman's
unlawful and excessive use of force" and then "jumped on" Lewis
and assisted Lehman restrain Lewis "on the floor with their knees
when he was not resisting or committing any aggressive acts
towards the officers."  Id.  Lewis then alleges that Defendant
Dunkel and several officers "rushed on to the block with the RHU
camcorder" and advised Lewis that he would be placed in "the strip
cage to be search[ed]." Id., ¶ 80.  Defendant Dunkel had leg
restraints placed on Lewis and escorted him to the strip cage but
during this move to the strip cage Lehman allegedly "started
squeezing [Lewis] really hard causing him pain" and when Lewis
complained  "Defendant Lehman along with McDowell, McDermott and
others and with the approval of Lt. Dunkel slammed [Lewis] again
face first into the concrete floor causing him to experience
dizziness and his face to become cut and painfully swollen[.]"
Id., ¶ 81.

       With regard to the misconduct report for allegedly
assaulting Lehman which was generated as a result of this
incident, Lewis claims he was denied his right to attend the

17

hearing by Defendant Riggleman. Id., ¶¶ 44-49. Lewis claims that Riggleman falsely stated on a Department of Corrections' form that Lewis refused to attend the hearing. Id. Lewis contends that Defendants Eckard, Bickell, Corbin and Macintyre violated his rights by affirming the decision of the hearing examiner and denying grievances filed by Lewis relating to the incident. Id. Lewis further claims that Lehman and McDermott filed the misconduct report for the "purposes of covering up their unlawful use of deadly and excessive force and subjecting plaintiff to mental and emotional and physical pain" and that the administrative officials "tacitly" approved of the conduct of Lehman and McDermott. Id.

With regard to the April 7, 2011 allegedly false misconduct reports filed by Defendants Lehman and McDermott, Lewis does not claim they were filed because Lewis filed grievances. Instead Lewis claims as follows: "Defendant Lehman and McDermott with the tacitly expressed approval of the abovementioned officials issued the falsified misconduct for the sole and expressed purposes of covering up their unlawful use of deadly and excessive force and subjecting plaintiff to mental, emotional and physical pain and suffering in atypical and significant hardship RHU." Id., ¶ 49.

18

Lewis contends that Defendant Goss, a psychologist, on May 5, 2011, issued a false misconduct report in which Defendant Goss accused Lewis of sexually inappropriate behavior.[20] Id., ¶¶ 50-53 and 98-101. Lewis claims that Defendant Goss "was partaking in the custom of abuse of issuing false misconducts as a weapon of abuse against plaintiff" and that the misconduct report was "motivated by a retaliatory animus designed to deny plaintiff mental health services" needed to address the emotional pain he suffered as result of the assault by Defendant Lehman on April 7, 2011. Id. Lewis contends that Defendant Mitchell conspired with Defendant Goss by finding Lewis guilty of the misconduct and making false statements in the disciplinary hearing disposition sheet relating to Lewis's alleged admission that he wanted to see a female psychologist. Id. Lewis contends that "Defendant Mitchell made this false statement that plaintiff demanded to see a female to create the illusion that plaintiff was trying to be sexually inappropriate with female staff." Id. Lewis contends that Defendants Corbin, Bickell and Macintyre violated his rights by denying his administrative appeals of the hearing examiner's decision. Id. Lewis contends that he filed a grievance # 368834

---

20. It appears that the alleged sexually inappropriate behaviour was when a female psychologist came to Lewis's cell and while the psychologist was standing in front of the cell Lewis attempted to masturbate.

regarding this incident and that the grievance was denied by

"institutional and central office administrative officials,"

including Defendants Bickell and Varner. Id., ¶ 114.

Lewis claims that Defendant Fogel conspired with

Defendant Corbin on June 8, 2011, by issuing a false misconduct

report (B156415), i.e., spitting on Defendant Corbin, to justify

the use of force against Lewis on that day. Id., ¶¶ 54 and 110-

113.  On June 8th Lewis allegedly had a "surprise" PRC hearing and

was escorted to that hearing by Defendants Kyle and Riggleman. Id.

At the hearing Lewis was advised that he was being considered for

placement in the Special Management Unit. Id. Lewis contends that

when he attempted to state reasons against such placement

Defendant Corbin "cut him off mid sentence" at which point

the encounter escalated, and allegedly based on an order from

Defendant Corbin, Defendants Kyle and Riggleman slammed Lewis

"face first into the floor" and then "knee[d] him in the back and

[] head causing him to experience [an] excruciating amount of

pain." Id.  Defendant Fogel and another correctional officer then

"jumped on plaintiff[.]" Id.  Lewis claims that he had injuries to

his forehead and that Fogel, Kyle and Riggleman "forcefully put a

spit hood on [his] head and held him in a bent over position

further aggravating his lower back injury he suffered when he was

assaulted by officers on April 7, 2011 and escorted him to an

20

unsanitary cell" where he was examined by a nurse who "attempted under the guise of policy to coerce [him] to submit to a nude photo as a means of humiliating him[.]" Id., ¶ 112-13.

A hearing with respect to misconduct report B156415, i.e., spitting on Defendant Corbin, was scheduled for June 14, 2011. Id., ¶ 56. On June 9th Lewis claims that he submitted an inmate request for representation and witnesses. Id., ¶ 55. Lewis requested several witnesses, including Defendants Corbin, Kyle and Riggleman, and "camera footage" of the incident. Id. Lewis contends that on the date of the hearing Defendant Kyle and Defendant Mitchell denied him a hearing and he was found guilty of the misconduct. Id., ¶¶ 58-59. Lewis claims that Defendant Mitchell based on a statement from Defendant Kyle falsely noted in the disciplinary hearing report that Lewis refused to attend the hearing. Id.

Lewis claims that on August 9, 2011, he was issued a false misconduct report, apparently by Defendant McDermott,[21] for refusing to leave the law library. Id., ¶¶ 60-65. Lewis claims he was in the law library when McDermott along with another corrections officer entered escorting an inmate. Id. Lewis contends that McDermott stated that Lewis was "getting to (sic)

---

21. It is not clear if McDermott actually filed the misconduct report or that he merely instigated the filing by another corrections officer.

much law library time" and asked him "are you trying to sue me and Lehman? We're going to have to do something about that." Id. Lewis states that he responded by banging on the law library window to get the attention of a sergeant so that he could report the comment made by McDermott.  Id.  There is no indication that the sergeant responded and McDermott left but subsequently returned to escort one of the other inmate's using the library to his cell. Id. Lewis at that point asked McDermott to get the sergeant but responded by allegedly stating "law library restrictions that's going to suck" and departed the library without acting on Lewis's request to get the sergeant. Id. In response to the misconduct report, Lewis alleges that on August 10, 2011, he made a request in writing to Defendant Mitchell that the inmate who was escorted to the library by McDermott be called as witness at the disciplinary hearing scheduled for August 11, 2011. Id.  Lewis claims that Defendant Mitchell denied that request and found him guilty of the misconduct in violation of his due process rights and that the administrative appeals were denied by Defendants Garman, Eckard, Bickell, Beard and Wetzel as was their "custom." Id.  Lewis appears to allege that McDermott filed the misconduct charge because of a grievance Lewis previously filed.  Specifically, Lewis alleges as follows: "The issuance of the falsified misconduct was orchestrated by Defendant McDermott

22

he is the same officer who took part in the April 7th physical assault on plaintiff . . . and the time plaintiff was issued the falsified misconduct he had an abusive grievance pending against Defendant McDermott." Id., ¶ 61.

Lewis commences the third section of his amended complaint relating to the alleged "custom" of using excessive force by referring to an incident that occurred in November, 2009, but none of the individuals named as involved in that incident are defendants in the present action. Id., ¶¶ 66-70. In sum, Lewis contends that (1) on November 13, 2009, he was assaulted by Correctional Officer J.M. Gray; (2) he suffered no significant injuries; (3) several times after November 13th he had confrontations with Corrections Officer Gray where Gray verbally harassed him, including on May 5, 2010, when Gray allegedly stated that "he would beat [Lewis's] 'skinny black ass' if he came out to general population from the RHU;" (4) because of the harassment he filed a grievance in which he requested "a permanent separation between him and offc. Gray;" (5) the grievance was denied at the institutional level and his administrative appeals were denied; and (6) the denial of his grievance "opened the door for plaintiff to be subjected to more severe physical assaults that are part of the RHU custom of abuse in SCI-Huntingdon of using excessive force as a means of punishment against inmates." Id.

23

Lewis then elaborates on the January 3, 2011 "night light" incident with Corrections Officer Watt and the April 7, 2011 incident with Defendants Lehman and McDermott, which were mentioned previously.  With respect to the April 7th incident, Lewis claims that on April 10, 2011, he filed a grievance # 361318 and then, on April 11, 2011, informed Defendants Bickell and Eckard of the incident. Id., ¶¶ 89-91.  Lewis claims that both Bickell and Eckard "shrugged [him] off and told him that he doesn't need to be protected and when [he] went on to inform them that this was not the first time he'd been assaulted Eckard shrugged him off again saying 'so what.'" Id., ¶ 91.

Lewis then alleges that on April 16, 2011, after receiving the grievance relating to the April 7th incident, Defendant Johnson "secretly closed the investigation by typing a written response to plaintiff's grievance denying him all relief and never informing him of the response and conclusion of the investigation[.]" Id., ¶ 93. Lewis further contends that on May 31, 2011, "the assistant facility grievance coordinator who [he] believes at the time was C.M. Cook[22] filed an investigation extension notification form and provided Lt. Johnson with a copy." Id. Lewis claims that neither Johnson nor Cook informed him of the results of the investigation but that "2½ months after the

_____

22.  C. M. Cook is not named as a defendant.

investigation extension form was filed" he contacted the grievance coordinator[23] through a request form and the grievance coordinator informed him that "his grievance had been responded to by Lt. Johnson on April 16th and she also provided [him] with a copy of the original grievance response with Lt. Johnson's signature on it." Id., ¶ 94.  After Lewis received the response from the grievance coordinator he took steps to exhaust his administrative remedies but prior to elaborating on those steps in his amended complaint, he alleges an additional step he took prior to receiving the response from the grievance coordinator.

Lewis claims that on April 13, 2011, he "sent an abuse complaint" to Defendant Barnacle informing him of the April 7, 2011 assault and that Barnacle "knowing that the investigation had been closed by Lt. Johnson" responded falsely on May 3, 2011 that the "assault incident was still under investigation and that plaintiff would be informed of the results and findings of the investigation by the institution's security office." Id., ¶ 95. Lewis contends that Barnacle "refused to use his investigative powers to look into the custom of abuse plaintiff was being subjected to after he was informed by plaintiff that the institutional investigation were basically a sham." Id.  Lewis

---

23.  Lewis does not give the name of the grievance coordinator. The court assumes that he is referring to Defendant Green.

further asserts that Barnacle conspired with Johnson, Bickell and
Wetzel to manipulate "the investigation procedure in order to
deceive plaintiff into thinking that an ongoing investigation was
being conducted in hopes that such deception would cause plaintiff
not to exhaust his abuse grievance . . . in an effort to insulate
Defendant officers who assaulted plaintiff from liability and
discipline for the unlawful conduct they engaged in."  Id., ¶ 96.

     After receiving the response from the grievance
coordinator, Lewis alleges that he "immediately filed an appeal"
and that both Defendants Bickell and Varner "systematically denied
plaintiff's appeals and knowingly made false statements in the
appeal responses by going along with the false story concocted by
Dunkel and Lehman that plaintiff assaulted the officer in order to
conceal contraband and falsely accusing him of being in possession
of contraband[]."  Id., ¶ 97.  Lewis further claims that Bickell
and Varner's actions in denying his appeals "were in furtherance
of the sham investigation conspiracy designed to cover up the
assault by making it seem that the officers actions were justified
in order to insulate the officers from discipline and liability,
and further encouraging the custom of abuse that has been
established in SCI-Huntingdon's RHU with their tacitly expressed
approval." Id.

26

Lewis claims that on May 27, 2011, a correction officer who Lewis knew as "Ritchey"[24] came to his cell with a message from Defendant Lehman. Id., ¶ 104.  The message was that Lehman had been promoted to sergeant and that Lewis should be ready for round two. Id.  Lewis subsequently filed a grievance # 367410 regarding the incident in which he apparently asked for a "permanent security related separation" from Lehman. Id., ¶¶ 105-109. The grievance was denied by Defendants Fogel, Bickell and Varner. Id.

On or about July 13, 2011, Lewis alleges that he sent "correspondence pertaining to [his] [Special Management Unit] referal" (sic) to Defendant Wetzel. Id., ¶ 115.  In that letter Lewis claims he detailed some of the abuses to which he was being subjected. Id.  He contends that Defendant Wetzel had his assistant reply to the letter by writing that the "allegation pertaining to the custom of abuse were unsubstantiated[.}" Id. Lewis alleges that Wetzel did not take "any steps to inquire into the validity of the facts" and "deliberately failed to act upon valid information that there was an ongoing custom of abuse in SCI-Huntingdon which plaintiff was subjected to[.]" Id.

Lewis next claims that he was subjected to a "custom of demeaning sexual harassment and voyeuristic nude photography" while incarcerated for 3½ years in the RHU at SCI-Huntingdon. Id.,

---

24.  Corrections Officer "Ritchey" is not named as a defendant.

27

¶¶ 116-141.  Lewis alleges that there is a "secret" Department of Corrections' use of force policy involving the "act of photographing inmates in the nude" which has "opened the door to sexual voyeurism, demeaning sexual harassment and vengeful officers [provoking] inmates into cell extractions in order to use such humiliating and degrading treatment as a weapon of abuse[.]" Id., ¶ 117.  Lewis claims that twice in October 2010, he was subjected to "having nude photos taken." Id., ¶ 118.  Lewis contends that one of the instances was the result of a "provoked cell extraction" and that Defendant Fogel was involved. Id.  Lewis does not give any details regarding the second October incident. Id.

   With respect to the one incident in October where Defendant Fogel was involved, Lewis apparently is referring to the incident on October 28, 2010, where he alleges he was "provoked into a cell extraction" by Corrections Officer Spillman who "verbally assaulted" him "in a hostile tone of voice" and Lewis "[b]ecause of the serious provocation from the inflammatory language that enraged him . . . accepted the officer's challenge[.]" Id., ¶ 10.

   Lewis also appears to refer to the January 3, 2011, incident where Corrections Officer Watt ordered him to uncover his night light and he was subsequently removed from his cell by

several corrections officers, including Lt. Fogel. Id., ¶¶ 72-74 &
120.   During this incident Lewis alleges he was subjected to nude
photography. Id.   However, with respect to the other incidents of
alleged nude photography, Lewis does not refer to any of the named
defendants as being involved.

Lewis alleges that in November 2010, he observed another
inmate forcefully removed from his cell and photographed while
naked by a female nurse. Id., ¶ 119.   Lewis alleges that he filed
grievances regarding the policy which were denied by Defendants
Green, Corbin, Bickell, Varner and Wetzel. Id., ¶¶ 122-127.

On or about July 14, 2011, Lewis alleges that a nurse
employed by SCI-Huntingdon made "sexually harassing comments about
an inmate while she was walking down the tier" and that when Lewis
attempted to ask her a "medical related question when she came
near [his] cell" she referred to Lewis as an "asshole" and when
Lewis stated he was going to report the comment, she responded "by
threatening to 'show everybody pictures of [his private parts].'"
Id., ¶ 129.   Lewis also alleges that another nurse made similar
comments and apparently when asked "a rhetorical question" by
Lewis as to whether the nude photographs were being used to
humiliate and degrade inmates, the nurse responded "that's my
job." Id., ¶ 132.   Lewis alleges that in May 2011, a nurse "made a
comment about having nude photos of all the inmates subjected to

29

the Department's nude photography" and "her comment led plaintiff to the belief that Department employees were tak[ing] the photos out of the institution to their homes to be uploaded onto their desktops[.]" Id., ¶ 135. Lewis alleges he filed grievances relating to the policy of photographing inmates while naked. Id., ¶¶ 122-128 and 130-134. In the grievances, Lewis informed Defendants Green, Bickell and Varner that the abusive behavior by the nurses "stems from the nude photography policy" and that "nursing staff were using it as a means of humiliation and degradation and fun and entertainment as part of the sexual voyeurism that the policy has opened the door to." Id. All of his grievances were denied by Defendants Green, Bickell, Varner and Wetzel. Id.

Lewis alleges that in February 2012, he filed an ethics complaint with Defendant Barnacle relating to the alleged policy of photographing inmates when naked. Id., ¶¶ 135-138. Lewis contends that Barnacle initiated an investigation but that it was a "sham" and he was never informed of the results of the investigation. Id. Lewis alleges that he was interviewed by a Security Lieutenant Tkacs of SCI-Fayette regarding the ethics complaint and that Lt. Tkacs informed him that SCI-Fayette does not have a policy which "requires inmates to submit to nude photos and further that no kind of policy exists that gives officers

30

and/or medical staff the authority to perform nude photography on inmates and force them against their will to participate in the nude photography." Id.  Lt. Tkacs also allegedly stated that "SCI-Fayette doesn't perform nude photography and that perhaps it may be a SCI-Huntingdon institutional practice." Id., ¶ 137.

Lewis alleges that Defendant Wetzel because of his supervisory position was responsible for "all the actions and omissions of the officers and administrative officials in enforcing a nude photography policy and using it as a weapon of abuse against inmates" and that Wetzel and Bickell were "deliberately indifferent in failing to train their employees in regard to the appropriate lawful constitutional policies, protocols and procedures in conducting strip searches on inmates during the use of force" and his failure of properly training personnel "evidenced a callous disregard for [his] federally protected rights[.]" Id., ¶¶ 140-141.

Finally, Lewis claims that he was subjected to a systematic denial of grievances by Defendants Varner and Wetzel, including by "procedural manipulation tactics."  Id., 142-148.[25]

_____

25.  In paragraph 139, Lewis also claims that his rights were violated under several sections of the Pennsylvania Crimes Code by Defendants Fogel, Bickell, B. Corbin, Green, Varner, Bernancle and Wetzel. These allegations are not cognizable under 42 U.S.C. § 1983. Elkin v. Fauver, 969 F.2d 48, 52 (3d Cir. 1992)("An alleged violation of state law . . . does not state a claim under
(continued...)

IV.     **Discussion**

Defendants raise four arguments in support of their motion to dismiss portions of the amended complaint.  First, Defendants Wetzel, Bickell, Lawler, Eckard, Corbin, Garman, Keller, Mitchell, Green, MacIntyre, Lewis, Beard, Barnacle and Varner request that the amended complaint be dismissed as it relates to them for failure to alleged sufficient personal involvement.  (Doc. No. 39 at 5-7.)  Second, Defendants argue that any purported constitutional violations based on verbal harassment should be dismissed for failure to state a claim upon which relief can be granted. (Id at 8.)  Third, Defendants contend that the conspiracy claims against them should be dismissed because the allegations are conclusory and speculative.  (Id at 8-9.) Finally, Defendants argue that Plaintiff's claims against them in their official capacities for money damages should be dismissed as barred by the Eleventh Amendment.  (Id at 10.)  The court will now address these arguments and commence with the issue of whether Lewis has sufficiently alleged a conspiracy claim against the Defendants and, thereafter, proceed in the order the arguments were presented by the Defendants.  After addressing Defendants'

---

25.  (...continued)
section 1983.");  Funk v. Wetzel, 2015 WL 2338995, *5 (M.D. Pa. May 12, 2015);  Spell v. Allegheny County Administration, 2015 WL 1321695, *4 (W.D. Pa. Mar. 24, 2015).

arguments, the court will review the amended complaint pursuant to the screening provisions of the PLRA.

### A. Conspiracy

In order to set forth a cognizable conspiracy claim, a plaintiff cannot rely on broad or conclusory allegations. D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1377 (3d Cir. 1992) cert. denied, 506 U.S. 1079 (1993); Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989); Durre v. Dempsey, 869 F.2d 543, 545 (10th Cir. 1989). The Court of Appeals for this circuit has further noted that "[a] conspiracy claim must . . . contain supportive factual allegations." Rose, 871 F.2d at 366. Moreover, "[t]o plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1166 (3d Cir. 1989).

The essence of a conspiracy is an agreement or concerted action between individuals. See D.R. by L.R., 972 F.2d at 1377; Durre, 869 F.2d at 545. Consequently, a plaintiff must allege present material facts from which it could be concluded that the purported conspirators reached some understanding or agreement or plotted, planned and conspired together to deprive plaintiff of a protected federal right. Id.; Rose, 871 F.2d at 366; Young, 926

F.2d at 1405 n.16; <u>Chicarelli v. Plymouth Garden Apartments</u>, 551

F. Supp. 532, 539 (E.D. Pa. 1982).  Where a civil rights

conspiracy is alleged there must be some specific facts in the

complaint which tend to show a meeting of the minds and some type

of concerted activity.  <u>Deck v. Leftridge</u>, 771 F.2d 1168, 1170

(8th Cir. 1985).  A plaintiff cannot rely on subjective suspicions

and unsupported speculation.  <u>Young v. Kann</u>, 926 F2d 1396, 1405

n.16 (3d Cir. 1991).

  Viewing the amended complaint in the light most

favorable to Lewis, it is clear that Lewis has failed to state a

viable conspiracy claim against any of the Defendants.  There are

no averments of fact in the complaint that reasonably suggest the

presence of an agreement or concerted activity between Defendants

to violate Lewis's civil rights.  Lewis's vague and conclusory

allegations of a conspiracy fail to satisfy the pleading

requirements of <u>Twombly</u> and <u>Iqbal</u>.

### B. Personal Involvement

  A plaintiff, in order to state a viable § 1983 claim,

must plead two essential elements:  1) that the conduct complained

of was committed by a person acting under color of state law, and

2) that said conduct deprived the plaintiff of a right, privilege,

or immunity secured by the Constitution or laws of the United

States.  <u>Groman v. Township of Manalapan</u>, 47 F.3d 628, 638 (3d

Cir. 1995); <u>Shaw by Strain v. Strackhouse</u>, 920 F.2d 1135, 1141-42 (3d Cir. 1990).

Moreover, in addressing whether a viable claim has been stated against a defendant the court must assess whether Lewis has sufficiently alleged personal involvement of the defendant in the act which he claims violated his rights.  Liability may not be imposed under § 1983 on the traditional standards of <u>respondeat superior</u>.  <u>Capone v. Marinelli</u>, 868 F.2d 102, 106 (3d Cir. 1989) (citing <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1017, 1082 (3d Cir. 1976)).  In <u>Capone</u>, the court noted "that supervisory personnel are only liable for the § 1983 violations of their subordinates if they knew of, participated in or acquiesced in such conduct."  868 F.2d at 106 n.7.

There are only two avenues for supervisory liability. First, as mentioned above if the supervisor knew of, participated in or acquiesced in the harmful conduct, and second, if a supervisor established and maintained a policy, custom or practice which directly caused the constitutional harm. <u>Id.</u>; <u>Santiago v. Warminster Township</u>, 629 F.3d 121, 129 (3d Cir. 2010); <u>A.M. ex rel. J.M.K. v. Luzerne County Juvenile Center</u>, 372 F.3d 572, 586 (3d Cir. 2004).  However, with respect to the second avenue of liability conclusory, vague and speculative allegation of custom, policy or practice are insufficient under <u>Twombly</u> and <u>Iqbal</u>. <u>Id.</u>

Although Lewis divides his amended complaint into five sections, it is a rambling, disjointed and far from coherent document.  With respect to defendants Wetzel, Bickell, Lawler, Green, Garman, MacIntyre, Robin Lewis, Beard, Barnacle and Varner, the court discerns no allegations in the complaint that they were involved in any conduct which violated Lewis's constitutional rights.  Their only involvement was with respect to the handling of Lewis's grievances and appeals from disciplinary proceedings. Such involvement is insufficient as a matter of law to render those defendants liable.  "[T]he failure of a prison official to act favorably on an inmate's grievance is not itself a constitutional violation."  Rauso v. Vaughn, Civil No. 96-6977, 2000 WL 873285, at *16 (E.D.Pa., June 26, 2000). See also Overholt v. Unibase Data Entry, Inc., 221 F.3d 1335 (Table), 2000 WL 799760, at *3 (6th Cir.2000) ("The defendants were not obligated to 'properly' respond to Overholt's grievances because there is no inherent constitutional right to an effective prison grievance procedure. Hence, his allegations that the defendants did not properly respond to his grievances simply do not rise to the level of a constitutional violation.") (citations omitted); Mitchell v. Keane, 974 F.Supp. 332, 343 (S.D.N.Y.1997) ("it appears from the submissions before the court that Mitchell filed grievances, had them referred to a prison official, and received a letter

reporting that there was no evidence to substantiate his complaints. Mitchell's dissatisfaction with this response does not constitute a cause of action."); Caldwell v. Beard, Civil No. 2:07-CV-727, 2008 WL 2887810, at *4 (W.D.Pa. July 23, 2008) ("Such a premise for liability [i.e., for performing a role in the grievance process] fails as a matter of law."), aff'd,--- Fed.Appx. ----, 2009 WL 1111545 (3d Cir. April 27, 2009); Caldwell v. Hall, Civil No. 97-8069, 2000 WL 343229, at *2 (E.D.Pa. March 31, 2000) ("The failure of a prison official to act favorably on an inmate's grievance is not itself a constitutional violation."); Orrs v. Comings, Civil No. 92-6442, 1993 WL 418361, at *2 (E.D.Pa. Oct.13, 1993) ("But an allegation that a defendant failed to act on a grievance or complaint does not state a Section 1983 claim."); Jefferson v. Wolfe, Civil No. 04-44, 2006 WL 1947721, at *17 (W.D. Pa. July 11, 2006) ("These allegations [of denying grievances or grievance appeals] are insufficient to establish such Defendants' personal involvement in the challenged conduct under Section 1983. See Watkins v. Horn, 1997 WL 566080 at * 4 (E.D.Pa..[sic] 1997) (concurrence in an administrative appeal process is not sufficient to establish personal involvement)"). Consequently, Lewis claims against Wetzel, Bickell, Lawler, Green, Garman, MacIntyre, Robin Lewis, Beard, Barnacle and Varner are not viable and the complaint as it relates to them will be

37

dismissed.   Moreover, to the extent that Lewis seeks damages from Defendants Eckard, Keller and Corbin as a result of their handling grievances or appeals of grievances or disciplinary proceedings, those claims are also not viable.[26]

Lewis in the amended complaint sets forth some allegations against Eckard, Corbin and Keller beyond their mere involvement in addressing initial grievances, appeals of denied grievances, and appeals of the results of disciplinary hearings. As stated above, Lewis alleges that Keller, Eckard and Corbin presided at a Program Review Committee hearing in December 2010, and that Corbin "speaking on behalf of the committee" denied Lewis a transfer to another prison.   Lewis further alleges that Corbin falsified the PRC report by stating Lewis was engaging in manipulative behavior and that this alleged false statement was in retaliation for Lewis previously filing grievances regarding abusive practices in the RHU at SCI-Huntingdon.

Initially, a prisoner in a retaliation case must demonstrate that the conduct which led to the alleged retaliation was constitutionally protected. <u>Rauser v. Horn</u>, 241F.3d 330, 333 (3d Cir. 2001); <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378, 389 (6th Cir.

---

26.  Also, the claims against Defendant Johnson will be dismissed pursuant to the screening provisions of the PLRA because Defendant Johnson's only involvement was investigating Lewis's grievance relating to the April 7, 2011, incident.

1999)(en banc).   It is clear that a prisoner filing a civil action in court for harmful conditions of confinement is a protected activity under the First Amendment. <u>Milhouse v. Carlson</u>, 652 F.2d 371, 374 (3d Cir. 1981).   A prisoner also has a First Amendment right to file a non-frivolous grievance regarding prison conditions. <u>Cf.</u> <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003); <u>Glenn v. DelBalso</u>, 599 Fed.App'x. 457 (3d Cir. April 15, 2015); <u>Noble v. Schmitt</u>, 87 F.3d 157, 162 (6th Cir. 1996)(a prisoner has a First Amendment right to file grievances against prison officials).

In addition to the requirement of establishing an underlying constitutional right, the prisoner must allege that he or she suffered an adverse action or harm as result of the alleged retaliation and that the exercise of the inmate's constitutional right was a substantial motivating factor in the state actor's decision to take the alleged retaliatory action. <u>Rauser</u>, 241 F.3d at 333.   A prisoner satisfies the adverse action prong by alleging facts which would be sufficient to deter a person of ordinary firmness from exercising his constitutional right.   <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000).   Lewis has failed to allege facts that satisfy the adverse action prong.   There are no allegations in the amended complaint from which it can be concluded that Lewis suffered harm, i.e., adverse action, as a

result of Corbin's statement that he was engaging in manipulative behavior in the PRC report, and apparently the acquiescence of Keller and Eckard in the statement.  Furthermore, a review of Lewis' amended complaint does not reflect that he was subjected to the required adverse action because he continued to file numerous grievances concerning the conditions of his confinement.  Cf. Brown v. Hannah, 850 F.Supp. 471, 479 (M.D.Pa. 2012). Consequently, the claims against Corbin, Keller and Eckard relating to the statement in the PRC report and the denial of a transfer to another prison are not actionable.[27]

Lewis also sets forth claims against Defendant Mitchell who adjudicated Lewis's numerous misconduct charges.  Lewis claims that Mitchell denied him his right to due process under the Fourteenth Amendment.  Because Mitchell was personally involved in these disciplinary proceedings, the claim against Mitchell cannot be dismissed on the basis of lack of personal involvement. However, we will hereinafter address these claims pursuant to the screening provisions of the PLRA.

### C. Verbal Harassment

---

27.  Although Lewis was ultimately transferred to SCI-Graterford, it is well-settled that a prisoner has no justifiable expectation that he will be incarcerated in a particular prison.  Olim v. Wakinekona, 461 U.S. 238 (1983).  Furthermore, this court knows of no Pennsylvania state regulation which confers a protected liberty interest in a state inmate being or not being transferred.

Defendants make a blanket argument that Lewis's harassment claims should be dismissed without delineating the alleged incidents of harassment.  Specifically, they argue that "[t]o the extent that [Lewis] alleges he was subjected to verbal harassment, he fails to state a claim, because mere threatening, even violent, language and gestures of a Corrections employee do not amount to constitutional violations."  Doc. 29, Brief In Support, at 8. The court agrees that mere verbal harassment is not actionable under § 1983. Johnson v. Glick, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973); Maclean v. Secor, 876 F. Supp. 695, 698-99 (E.D. Pa. 1995); Murray v. Woodburn, 809 F. Supp. 383, 384 (E.D. Pa. 1993) ("Mean harassment . . . is insufficient to state a constitutional deprivation."); Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 189 (D.N.J. 1993) ("[V]erbal harassment does not give rise to a constitutional violation enforceable under § 1983.").

Mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations. Fisher v. Woodson, 373 F. Supp. 970, 973 (E.D. Va. 1973); see also Balliet v. Whitmire, 626 F. Supp. 219, 228-29 (M.D. Pa.) ("[v]erbal abuse is not a civil rights violation . . ."), aff'd, 800 F.2d 1130 (3d Cir. 1986) (Mem.).  A constitutional claim based only on verbal threats will fail regardless of whether it is

asserted under the Eighth Amendment's cruel and unusual punishment clause, see Prisoners' Legal Ass'n, 822 F. Supp. at 189, or under the Fifth Amendment's substantive due process clause, see Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991).

Verbal harassment or threats, with some reinforcing act accompanying them, however, may state a constitutional claim. For example, a viable claim has been found if some action taken by the defendant escalated the threat beyond mere words. See Northington v. Jackson, 973 F.2d 1518 (10th Cir. 1992) (guard put a revolver to the inmate's head and threatened to shoot); Douglas v. Marino, 684 F. Supp. 395 (D.N.J. 1988) (involving a prison employee who threatened an inmate with a knife). It has also been found that verbal harassment can rise to a constitutional level in a situation where fulfillment of the threat was conditioned on the inmate's exercising some constitutionally protected right. Bieros v. Nicola, 860 F. Supp. 226, 233 (E.D. Pa. 1994); see also Prisoners' Legal Ass'n, 822 F. Supp at 189; Murray, 809 F. Supp. at 384.

The court's review of the amended complaint reveals five instances of alleged verbal harassment or threats. First, on October 31, 2010, Defendant Heaster allegedly "verbally assault[ed] [Lewis] with abusive and threatening language." However, there are no allegations that the verbal harassment

escalated beyond mere words.  Furthermore, there are no
allegations that the verbal threats were conditioned on Lewis
exercising a constitutional right.  Second, Lewis claims that on
January 13, 2011, Defendant Cook threatened him when Lewis
complained about his food being contaminated.  Again there are no
allegations that the verbal threat escalated beyond mere words or
the verbal threat was conditioned on Lewis exercising a
constitutional right. Third, Lewis alleges that on April 7, 2011,
Defendant Lehman verbally threatened him by stating that if Lewis
moved he would "break his '[expletive] head'" and that this
encounter did escalate into violence.  Fourth, Lewis alleges that
on May 27, 2011, a correctional officer named "Ritchey" came to
his cell with a message from Lehman that he had been promoted to
sergeant and that Lewis should be ready for round two.  Again
there are no allegations that the verbal threat escalated beyond
mere words or the verbal threat was conditioned on Lewis
exercising a constitutional right.  In fact after May 7, 2011,
there is no indication in the amended complaint that Lewis had any
encounters with Lehman.  Fifth, Lewis alleges that on August 9,
2011, he was in the law library when Defendant McDermott entered
the library and stated that he was getting to much law library
time and asked Lewis whether he was trying to sue him and Lehman.
Lewis admits that in response to that statement he began banging

43

on the law library window and contends he asked McDermott to get
the sergeant but McDermott refused and responded by stating "law
library restrictions that's going to suck."  Although Lewis was
subsequently charged with refusing to leave the law library when
ordered to do so, again there are no allegations that the verbal
threat escalated beyond mere words or the verbal threat was
conditioned on Lewis exercising a constitutional right
Consequently, Lewis's verbal harassment claims will be dismissed
except for the incident on April 7, 2011, with Lehman which
escalated into violence.

### D.  Official Capacity Claims

Defendants argue that Lewis's claims against them for
compensatory and punitive damages in their official capacities
should be dismissed.  The court agrees with that argument. A state
official sued in his or her official capacity is not a "person"
for purposes of § 1983 where the relief sought is monetary damages
because the Supreme Court has not construed § 1983 as an
abrogation of the states' Eleventh Amendment immunity.  Will v.
Michigan Department of State Police, 491 U.S. 58, 63-71 (1989).
Will clearly precludes actions for damages against state officials
acting in their official capacities.  Consequently, to the extent
Lewis seeks damages against the Defendants in their official
capacities, those claims will be dismissed.

44

### E.   Misconduct Charges and Disciplinary Hearings

Lewis sets forth numerous allegations that he was subjected to false misconduct charges and that Defendant Mitchell denied him due process at the disciplinary hearings.  However, there are no allegations in the amended complaint from which it can be concluded that Defendant Mitchell found Lewis guilty of the charges because Lewis filed grievances or engaged in other First Amendment protected activity.  Lewis also alleges that Mitchell, *inter alia*, denied him the right to call witnesses, present and view evidence, and appear at the hearings as well as made false statements in the hearing disposition forms. Lewis alleges that this conduct by Mitchell was a violation of his right to due process under the Fourteenth Amendment.

The Fourteenth Amendment of the United States Constitution provides in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  The Supreme Court has mandated a two-part analysis of a procedural due process claim:  first, "whether the asserted individual interests are encompassed within the . . . protection of 'life, liberty or property[,]'" and second, "if protected interests are implicated, we then must decide what procedures constitute 'due process of law.' " Ingraham v. Wright, 430 U.S. 651, 672 (1977).  If there is no protected liberty or

property interest, it is obviously unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred.

Liberty interests protected by the Fourteenth Amendment may arise either from the Due Process Clause itself or from state law. Meachum v. Fano, 427 U.S. 215, 223-26 (1976).  In Wolff v. McDonnell, 418 U.S. 539, 563-573 (1974), where the plaintiffs were deprived of good time credits as a severe sanction for serious misconduct, the Supreme Court held that such inmates have various procedural due process protections in a prison disciplinary proceeding, including the right to call witnesses and to appear before an impartial decision-maker.[28]

---

28. In Wolff, the Supreme Court recognized that "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Id. at 556.  Nonetheless, the Supreme Court held that a prisoner facing serious institutional sanctions is entitled to some procedural protection before penalties can be imposed. Id. at 563-71.  The Supreme Court set forth five requirements of due process in a prison disciplinary proceeding: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the charges; (3) an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative, if the charged inmate is illiterate or if complex issues are involved; (5) a written decision by the fact finders as to the evidence relied upon and the rationale behind their disciplinary action. Id.

An additional procedural requirement was set forth in Superintendent, Massachusetts Correctional Institution at
(continued...)

Thereafter, the Court in <u>Hewitt v. Helms</u>, 459 U.S. 460, 471 (1983), stated that a state law which "used language of an unmistakably mandatory character" creates a protected liberty interest.   Following <u>Hewitt</u> many courts held that a state regulation can create a due process interest -- such as freedom from punitive segregation -- if the rule contains mandatory language such as "shall" or "will."   <u>E.g.</u>, <u>Layton v. Beyer</u>, 953 F.2d 839, 848-49 (3d Cir. 1992).   Our Court of Appeals, this court, and other courts applied the <u>Wolff</u> principles to prison disciplinary hearings which did not result in withdrawal of good time credit but instead in disciplinary or administrative segregation.   <u>E.g.</u>, <u>Grillo v. Coughlin</u>, 31 F.3d 53 (2d Cir. 1994); <u>Griffin v. Spratt</u>, 969 F.2d 16 (3d Cir. 1992); <u>Cook v. Lehman</u>, 863 F. Supp. 207 (E.D. Pa. 1994); <u>Edwards v. White</u>, 501 F. Supp. 8 (M.D. Pa. 1979), <u>aff'd</u>, 633 F.2d 209 (3d Cir. 1980).

The Court's decision in <u>Sandin v. Conner</u>, 115 S.Ct. 2293 (1995), however, marked a shift in the focus of liberty interest analysis from one "based on the language of a particular regulation" to "the nature of the deprivation" experienced by the prisoner.   <u>Id.</u> at 2299.   In <u>Sandin</u> the Court was presented with

---

(...continued)
<u>Walpole v. Hill</u>, 472 U.S. 445, 453-456 (1985).   In that case, the Court held that there must be some evidence which supports the conclusion of the disciplinary tribunal.

the procedural due process claims of a state prisoner who had been found guilty of misconduct and sentenced to 30 days in disciplinary segregation.  Id. at 2296-97.  The Court first found that the approach adopted in Hewitt – described above -- was unwise and flawed.  Id. at 2298-2300.  The Court also rejected plaintiff Conner's argument that "any state action taken for punitive reasons encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation."  Id. at 2300.  The Court reasoned, inter alia, that "[d]iscipline by prison officials in response to a wide range of misconduct" is expected as part of an inmate's sentence.  Id. at 2301.  The nature of plaintiff Conner's confinement in disciplinary segregation was found similar to that of inmates in administrative segregation and protective custody at his prison.  Id.

Focusing on the nature of the punishment instead of on the words of any regulation, the Court held that the procedural protections in Wolff were inapplicable because the "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest."  115 S.Ct. at 2301.  The Court examined the nature of Conner's disciplinary segregation and found that "[b]ased on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there

48

for 30 days did not work a major disruption in his environment."
Id.  In the final holding of the opinion, the Court stated "that
neither the Hawaii prison regulation in question, nor the Due
Process Clause itself, afforded Conner a protected liberty
interest that would entitle him to the procedural protections set
forth in Wolff." Id. (emphasis added).[29]

        In light of Sandin, prison disciplinary segregation will
violate the protected liberty interest of the Fourteenth Amendment
only if it dramatically departs, in length time or otherwise, from
basic prison conditions and imposes atypical, significant hardship
on the inmate.  This court and others within this circuit,
applying Sandin in various actions, have found no merit in the
procedural due process claims presented. See Smith v. Messinger,

---

29.  The Sandin Court relied on three factors in making this
determination: (1) confinement in disciplinary segregation
mirrored conditions of administrative segregation and other
forms of discretionary confinement; (2) based on a comparison
between inmates inside and outside segregation, the state's
action in placing the inmate there did not work a major
disruption in the inmate's environment; and (3) the state's
action did not inevitably affect the duration of inmate's
sentence.

        Furthermore, the majority in Sandin viewed administrative
or protective custody as "not atypical" and within the "ordinary
incidents of prison life."  115 S.Ct. at 2300-01.  Specifically,
the Court stated that "Conner's confinement did not exceed
similar, but totally discretionary confinement in either
duration or degree of restriction." Id. at 2301.  Consequently,
the appropriate point of comparison is between disciplinary
segregation and other forms of discretionary segregation, not
general population conditions.

293 F.3d 641, 653 (3d Cir. 2002)(seven months in disciplinary segregation is insufficient to trigger a due process violation); Griffin v. Vaughn, 112 F.3d 703, 706-708 (3d Cir. 1997)(no liberty interest avoiding fifteen (15) month placement in administrative custody because said confinement was not atypical); Young v. Beard, 227 Fed. Appx. 138 (3d Cir. 2007)(aggregate 980 days in disciplinary segregation did not violate the due process clause).

Although Lewis who is serving a life sentence alleges he was confined in the RHU at SCI-Huntingdon for 3½ years, he does not allege that the entire period of time was the result of disciplinary sanctions.  Lewis has not alleged the sanctions imposed on him by Defendant Mitchell with respect to each alleged false misconduct charge or how the conditions in the RHU impose atypical, significant hardship, in contrast to the ordinary incidents of prison life.  There are no allegations in the amended complaint from which it can be concluded that the incidents of disciplinary confinement in the present case are materially different than those the Supreme Court found to be "not atypical" in Sandin, or that they differ appreciably from those of administrative custody.  Consequently, the due process claims

leveled against Defendant Mitchell, the hearing officer, are not viable and will be dismissed.[30]

A review of the amended complaint reveals that Lewis has specified seven instances where he was subjected to alleged false misconduct reports by named defendants.  However, only one of these instances was allegedly in retaliation for prior protected First Amendment activity.  The seven instances, involving seven defendants, are as follows:

1) Defendant Heaster - Misconduct report of 8/4/10;

2) Defendant Heaster - Misconduct report of 10/31/10;

3) Defendant Cook - Misconduct report of 1/13/11;

4) Defendant Lehman - Misconduct report of 4/7/11;

5) Defendant McDermott - Misconduct report of 4/7/11;

6) Defendant Goss - Misconduct report of 5/5/11;

7) Defendant Fogel - Misconduct report of 6/8/11;

8) Defendant Corbin - Misconduct report of 6/8/11; and

9) Defendant McDermott - Misconduct report of 8/9/11.

---

30.  Also, there are two incidents where Lewis alleges that named defendants, Riggleman and Kyle, falsely reported on Department of Corrections' forms that Lewis waived his right to attend disciplinary hearings. The first incident relates to the hearing on misconduct arising out of the April 7, 2011, attempted assault on Defendant Lehman.  The second incident relates to the misconduct which was generated for spitting on Defendant Corbin on June 8, 2011.  Lewis's claims against Defendants Rigglemen and Kyle relating to these alleged false statements will be dismissed for the same reasons as the claims against Defendant Mitchell are being dismissed.

The misconduct report of August 9, 2011, is the only one where there is an allegation of retaliation based on the exercise of Lewis's rights under the First Amendment.

The filing of a false misconduct report does not violate an inmate's due process rights.  The general rule, as stated in Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986), provides that a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Consequently, with respect to six of the above enumerated instances, Lewis's amended complaint fails to state a claim upon which relief may be granted.  However, filing a false misconduct report is cognizable as a denial of due process when the false misconduct charge is filed "for the sole purpose of retaliating against an inmate for his/her exercise of a constitutional right" such as his or her right to file a grievance with state officials or a lawsuit regarding prison conditions.  Smith v. Messinger, 293 F.3d at 653-654.  Lewis has alleged retaliation with respect to the August 9, 2011, misconduct report but even with respect to that allegation under Smith the complaint fails to state a claim. The Court of Appeals in Smith stated as follows:

> Smith argues that "there is more" to his claim. However, he must clear two hurdles to overcome the district court's reliance on Freeman. First, it is now clear that the sanction Smith challenges (seven months

> disciplinary confinement) does not, on its own, violate
> a protected liberty interest as defined in <u>Sandin</u>.
> Therefore, he can not establish that the defendants'
> conduct denied him substantive due process by
> infringing upon a liberty interest. Second, he was
> afforded a hearing and therefore had the opportunity
> to confront and challenge the allegedly perjured
> testimony offered in support of the misconduct reports.

293 F.3d at 654.  Lewis's amended complaint although possibly

setting forth sufficient allegations of a denial of procedure due

process, such as the right to call witness and present evidence as

well as appear at a hearing, fails to delineate facts from which

it can be concluded as result of being found guilty of the

misconduct charges that he suffered an atypical and significant

hardship under <u>Sandin</u> and, therefore, his amended complaint fails

to state a claim upon which relief can be granted.  Consequently,

the court will dismiss the claims leveled against Defendants

Heaster, Cook, Lehman, Goss, Fogel, Corbin and McDermott with

respect to the alleged false misconduct reports.

An appropriate order will be entered.